LAWRENCE E. MILKOWSKI, Plaintiff-Appellant, *v.* THE DEPARTMENT OF LABOR *et al.*, Defendants-Appellees.

First District (4th Division)   No. 79-952

Opinion filed March 6, 1980.

Russell C. Green, of Chicago, for appellant.

William J. Scott, Attorney General, of Chicago (Richard J. Puchalski, Special Assistant Attorney General, of counsel), for appellees.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The plaintiff, Lawrence Milkowski, a day-by-day substitute teacher, unsuccessfully sought to recover Special Unemployment Assistance benefits provided under title II of the Emergency Jobs and Unemployment Assistance Act of 1974, 26 U.S.C. §3304 (note for the 1977 summer vacation period). The issue in the case is whether the plaintiff could properly be considered to have had a contract to teach the subsequent year. Both the Board of Review and the trial court held that he had. We agree.

Section 203(b) of title II of the Emergency Jobs and Unemployment Assistance Act of 1974 (note to 26 U.S.C. §3304 (1976)) provides in pertinent part:

"(b) An individual who performs services in an instructional, research, or principal administrative capacity for an educational institution or agency shall not be eligible to receive a payment of assistance or a waiting period credit with respect to any week commencing during the period between two successive academic years (or, when the contract provides instead for a similar period between two regular but not successive terms, during such similar period) if—

'(1) such individual performed services in any such capacity for any educational institution or agency in the first of such academic years or terms; and

(2) such individual has a contract to perform services in any such capacity for any educational institution or agency for the later of such academic years or terms.' "

The plaintiff applied for special assistance benefits for the period from June 19, 1977, through June 25, 1977. He was the sole witness at the hearing. He testified that he had been a full-time teacher from October 1974 to September 1, 1976. While he had been invited back as a full-time teacher in June 1976, they changed his position in September to that of a day-to-day substitute teacher. As a day-to-day substitute teacher he would teach at whatever school he was sent to on that particular day. In June 1977 he was not told to come back; nor was he told not to come back. In previous years, while he was a full-time teacher, he was always told in June that he was to come back in September.

The plaintiff applied for benefits in June. He did not register with the State employment service. He contacted a friend who owned a painting service but the business was closed for the summer. He looked at some want ads and contacted a few people. Such contacts were in his words "very few and far between."

In his opinion, the referee stated that where no affirmative action has been taken by an employee or the educational institution by whom the employee was employed there is a presumption or "reasonable assurance" that the employee will return to the same work the following term or semester and that for this reason the plaintiff was excluded from receiving benefits.

The Board of Review of the Department of Labor affirmed on the ground the plaintiff had a commitment to return to work when the new school year began. The trial court affirmed on the ground the plaintiff had an implied contract to work for the Chicago Board of Education in the

fall semester of 1977. The court noted that it also doubted that the plaintiff exerted sufficient effort to find another job.

We agree with the plaintiff that if the term "contract" in the statute means an agreement binding on a school board so that it could be held liable for damages for its breach there was no contract here. Clearly, the plaintiff being a nontenured day-to-day teacher could not force the school board to use him in the fall. But the issue in this case is whether the term "contract" as used in the statute has this limited meaning. Since we find that it does not, we affirm the denial of benefits.

The particular provision in issue was first interpreted by the Department of Labor in its role of explaining and implementing the intent of Congress. The United States Secretary of Labor in Unemployment Insurance Program Letter No. 29-75 which was distributed to the States defined "contract" as used in this section to include "either a verbal, written or implied agreement." "Implied agreement" was defined as follows: "If a teacher * * * has not resigned, has not retired or has not been terminated, there may be an implied continuing contractual relationship." (See *Ortiz v. Commonwealth Unemployment Compensation Board of Review* (1979), 42 Pa. Commw. 234, 400 A.2d 685; *Williamson v. Mississippi Employment Security Com.* (Miss. 1977), 347 So.2d 978.) While the Secretary's interpretation is not binding on this court (*Williamson v. Mississippi Employment Security Com.* (Miss. 1977), 347 So.2d 978; *Mississippi River Fuel Corp. v. Illinois Commerce Com.* (1953), 1 Ill. 2d 509, 116 N.E.2d 394; *Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 370 N.E.2d 3, *appeal denied*), the interpretation of a statute by the agency charged with the administration of the statute is entitled to substantial deference (*Quern v. Mandley* (1978), 436 U.S. 725, 56 L. Ed. 2d 658, 98 S. Ct. 2068), and such construction should be and normally is persuasive. *Mississippi River Fuel Corp. v. Illinois Commerce Com.* (1953), 1 Ill. 2d 509, 116 N.E.2d 394; *Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 370 N.E.2d 3, *appeal denied*; *Hardway v. Board of Education* (1971), 1 Ill. App. 3d 298, 274 N.E.2d 213.

The Special Unemployment Assistance program was set up to counter the severe unemployment problem that beset the nation in 1974 (*Imel v. Department of Employment* (1978), 99 Idaho 224, 580 P.2d 70; *Williamson v. Mississippi Employment Security Com.* (Miss. 1977), 347 So.2d 978; H. Rep. No. 1528, 93d Cong., 2d Sess., *reprinted in* [1974] U.S. Code Cong. and Ad. News 6760-61; S. Rep. No. 208, 94th Cong., 1st Sess. 2-4, *reprinted in* [1975] U.S. Code Cong. & Ad. News 378-80), and was intended to reach those actually unemployed and most in need of assistance to sustain their livelihood. (*Williamson v. Mississippi Employment Security Com.* (Miss. 1977), 347 So. 2d 978.) As stated in

*Chicago Teachers Union, Local No. 1, AFT/AFL/CIO v. Johnson* (N.D. Ill. 1976), 421 F. Supp. 1261, 1264-65:

"The stated purpose of the SUA program is to provide benefits for workers who are unemployed during a period of aggravated unemployment. [26 U.S.C. §3304 note 210]. The SUA program and the Emergency Unemployment Compensation Act of 1974 which it amends tie the availability of federal funds to 'emergency on' indicators which are based on the prevailing rate of insured unemployment in the given state. The programs provide assistance for long term unemployed persons who have exhausted available state unemployment compensation benefits. Certain provisions of the program predicate payment of benefits to acquisition of further job training to increase the re-employment potential of the recipient. The very nature of the compensation scheme, its extended duration and integral relation to prevailing economic factors, anticipates sustaining an unemployed worker during the search for re-employment in a locale marked by chronic unemployment and a depressed job market.

　　＊　＊　＊

The approach of Congress can fairly be characterized as restrictive, for in referring to the subsection 210 exclusion the Senate Report recognized that it will 'prohibit the states that may pay these benefits from doing so. It is to be noted that these benefits are financed 100 per cent from federal funds.' S. Rep. No. 137, 94th Cong., 1st Sess. 33 (1975). Undoubtedly the situation envisioned by Congress was a teacher who is 'totally out of work and desperately looking for [a] job[s]' in a market overloaded with professional educators. Hearings on HR 5899 before the Subcommittee on Unemployment Compensation of the Committee on Ways and Means, 94th Cong., 1st Sess. 194 (1975). In fact representatives of the National Education Association indicated that as teachers are generally employed on a yearly basis from August to September of the following year, the period for receipt of benefits does not commence in some states until the school term resumes, the contract has expired and the teacher is truly unemployed. Certainly, these statements cannot be read as a congressional intent that no benefits can be paid to teachers under contract. However, it is indicative of an underlying assumption that teachers with contracts for the term prior to the summer hiatus and for the term following it are not in fact unemployed. Thus a hypothetical teacher placed on economic layoff for the remaining school year who is without a contract for the subsequent academic year is truly unemployed. That teacher faces the risks of re-training

or relocation inherent in the restricted job market. The extended benefits of SUA may well be necessary in this emergency situation to sustain the teacher until further employment can be found."

And as stated in *Imel v. Department of Employment* (1978), 99 Idaho 224, 225, 580 P.2d 70, 71:

"It is clear from the legislative history that congress did not consider teachers between terms as those facing this economic crunch. Therefore they were not among those the Special Unemployment Assistance program was designed to reach."

Given the background and stated purpose of the Act, it becomes apparent that the Legislature did not intend the word "contract" in the Act to be given a strictly formal construction. (*Williamson v. Mississippi Employment Security Com.* (Miss. 1977), 347 So.2d 978; *Ortiz v. Commonwealth Unemployment Compensation Board of Review* (1979), 42 Pa. Commw. 234, 400 A.2d 685.) In light of this where the teacher has a reasonable expectation of employment, this satisfies the requirement of a "contract" for purposes of the Act. *Williamson v. Mississippi Employment Security Com.* (Miss. 1977), 347 So.2d 978; *Ortiz v. Commonwealth Unemployment Compensation Board of Review* (1979), 42 Pa. Commw. 234, 400 A.2d 685; *Scholtz v. Commonwealth Unemployment Compensation Board of Review* (1979), 42 Pa. Commw. 277, 400 A.2d 700; *Hyduchak v. Commonwealth Unemployment Compensation Board of Review* (1978), 35 Pa. Commw. 575, 387 A.2d 669; *Robinson v. Administrator Department of Employment Security* (La. App. 1977), 356 So.2d 477.

Accordingly, we are persuaded that the Secretary of Labor accurately interpreted the statute in his letter. Applying his interpretation it is clear that the Board of Review and trial court properly found an implied contract since the plaintiff "has not resigned, has not retired [and] has not been terminated." Compare *Williamson v. Mississippi Employment Security Com.* (Miss. 1977), 347 So.2d 978; *Scholtz v. Commonwealth Unemployment Compensation Board of Review* (1979), 42 Pa. Commw. 277, 400 A.2d 700; *Ortiz v. Commonwealth Unemployment Compensation Board of Review* (1979), 42 Pa. Commw. 234, 400 A.2d 685.

The plaintiff has attempted to distinguish the previously cited cases on the basis that they involved full-time teachers albeit the teachers were untenured. We believe this to be a distinction without a difference. As untenured teachers, the plaintiffs in the cited cases, just as the plaintiff in this case, could not force the school board to employ them, although, since they had not been officially terminated, they had reasonable expectations of reemployment. Indeed, in *Ortiz*, the teacher was notified in June that the school board did not have enough positions to offer but

that she should leave her summer address so that she could be contacted for reassignment if sufficient positions became available. Nevertheless, she was held not eligible for Special Unemployment Assistance benefits. Nor are we convinced by the plaintiff's argument that for the first time he was not told in June to return in September. Before he had been a full-time teacher. As a day-to-day substitute, assigned each day where and if needed, he could not be told in June what he would be doing in the fall.

As the Pennsylvania court stated in *Ortiz v. Commonwealth Unemployment Compensation Board of Review* (1979), 42 Pa. Commw. 234, 400 A.2d 685, school employees know that they generally will not be working during prescheduled vacations and during the summer recess, and we do not believe that Congress ever intended to subsidize summer vacations.

Judgment affirmed.

JOHNSON and JIGANTI, JJ., concur.